[Cite as *Loyalty 360, Inc. v. Empirical Edge, Inc.*, 2025-Ohio-2134.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| LOYALTY 360, INC., | : | APPEAL NO. C-240315 |
|  |  | TRIAL NO. A-2201262 |
| Plaintiff-Appellant, | : |  |
| vs. | : |  |
| EMPIRICAL EDGE, INC., | : | *JUDGMENT ENTRY* |
| Defendant-Appellee. | : |  |

This cause was heard upon the appeal, the record, the briefs, and arguments.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/18/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *Loyalty 360, Inc. v. Empirical Edge, Inc.*, 2025-Ohio-2134.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


LOYALTY 360, INC.,          :       APPEAL NO.    C-240315

             TRIAL NO.      A-2201262

         Plaintiff-Appellant,        :

vs.                            :

EMPIRICAL EDGE, INC.,      :       *O P I N I O N*

         Defendant-Appellee.       :


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 18, 2025


*Thomas Law Offices, PLLC,* and *Louis C. Schneider*, for Plaintiff-Appellant,

*Giles & Harper, LLC*, *Brian T. Giles* and *William C. Katz*, for Defendant-Appellee.

**Bock, Judge.**

**{¶1}** Dissatisfied with disruptions to a website that defendant-appellee Empirical Edge, Inc., ("Empirical") developed, plaintiff-appellant Loyalty 360, Inc., ("Loyalty") sued Empirical for breach of contract and unjust enrichment. On appeal, Loyalty challenges the trial court's directed verdict in Empirical's favor. Loyalty maintains that the trial court failed to construe the evidence in Loyalty's favor when it determined that Loyalty failed to establish (1) the terms of the oral contract that Empirical allegedly breached, and (2) that it would be unjust for Empirical to retain the compensation paid by Loyalty.

**{¶2}** We overrule Loyalty's assignment of error and hold that the trial court's decision, properly construed as a judgment of dismissal under Civ.R. 41(B)(2), was appropriately entered for Empirical on Loyalty's breach-of-contract claim. Loyalty failed to prove that, in the parties' oral contract, Empirical agreed to (1) assign only Kentico-certified employees to work on Loyalty's website, and (2) a standard of performance. We also hold that the trial court appropriately entered judgment in favor of Empirical on Loyalty's unjust-enrichment claim because the existence of an enforceable contract governing Empirical's work on Loyalty's website precludes recovery on the unjust-enrichment claim.

**{¶3}** We affirm the trial court's judgment.

## I. *Factual and Procedural History*

**{¶4}** Loyalty is a "trade association for individuals who have customer loyalty programs." According to Loyalty's owner, Mark Johnson, the company "facilitates the interaction between brands who are looking to develop customer loyalty through all types of technology." Carly Stemmer is a longtime employee and current member of Loyalty's management team, and described Loyalty as "a business-to-business

association for companies that have customer loyalty or rewards programs or companies that run those programs."

**{¶5}** In 2022, Loyalty sued Empirical in the Hamilton County Court of Common Pleas for damages stemming from Empirical's alleged breach of contract and unjust enrichment. Loyalty alleged that it "contracted with [Empirical] to provide . . . management and improvements to [Loyalty]'s website," and that Empirical failed to provide those services.

**{¶6}** While the Hamilton County case was pending, Empirical had claims pending against Loyalty in a Superior Court in Burlington County, New Jersey. The parties attempted to settle the matter and agreed to dismiss the respective lawsuits if Loyalty paid Empirical $25,000 and Empirical gave Loyalty its website's source code and data. But Loyalty refused to dismiss its complaint in this case because Empirical allegedly failed to upload uncompiled files. The trial court denied Empirical's motion to enforce the settlement agreement, and this court dismissed an appeal of that decision because it was not a final, appealable order. The trial court also denied Empirical's subsequent motion for summary judgment.

*The trial*

**{¶7}** At the bench trial, Loyalty called Johnson and Stemmer, along with Empirical's owner, to testify to the terms of its oral contract and to establish Empirical's breach of that contract.

**{¶8}** Johnson testified that Loyalty's business model is based on its website, which offers clients differing levels of access to Loyalty's content. Loyalty's website and annual conference "allow[] brands to get together and learn on different aspects [of] how to deal with privacy, how to deal with compliance around emotional loyalty." Johnson explained that some visitors peruse Loyalty's website for articles, while its

members rely on "research data and analyst reports." Its website "shar[es] and disseminat[es] information based on best practices that brands have around challenges and opportunities of customer loyalty."

{¶9} Empirical is a "software development" company founded by Dipal Parikh and headquartered in New Jersey. Empirical has roughly 20 employees who work remotely from India. Parikh has a master's degree in computer science and trains his employees on "[a]ll the software development and stuff, all the training that they need to do the work done." Parikh identified two employees that worked on Loyalty's website and mobile app, Pankil and Nafisha. Both have master's degrees in computer science from accredited universities.

## A.  *Loyalty's website and Kentico*

{¶10} Loyalty uses Kentico to host its website. Johnson has no formal background or training in software or website development, but testified that Kentico is "a CMS, a Content Management System." He explained that Kentico offers three versions: "Kentico Portal[,] Kentico NBC[,] and the .NET." Johnson testified that "most developers are .NET-based developers where Kentico Portal is a very specific type of development." Stemmer testified that Kentico "is a website content management system and marketing platform." She explained that, with Loyalty's "association and being membership-base[d], people will create accounts through the website and have log-ins."

{¶11} Parikh testified that "Kentico is not a programing language. It's a CMS. . . . a program in the .NET technology." Parikh explained that there are no certified Kentico developers who work for Empirical and that Pankil, the Empirical employee who worked on Loyalty's website, "is a .NET developer [and] has about 15 years of working experience with the .NET technology . . . and writ[ing] the code." Pankil has

5

"complete[d] multiple Kentico projects and is certified in software development and the training on software development."

{¶12} Parikh described Kentico certifications as "a marketing strategy." In reality, "[y]ou don't need Kentico certification to write the code that's written in a .NET." According to Parikh, "if you check the Kentico certification website it says that it's not required to work on Kentico [and instead is] to verify your knowledge of ASP.NET development."

### B. *Loyalty hired Empirical*

{¶13} In 2018, Loyalty decided to revamp its homepage for an autumn 2018 conference due to "challenges" with its website. Loyalty found Empirical through Upwork.com, a temporary-worker service. Johnson recalled that Empirical told him, "[Y]es, we're certified with Kentico. Yes, we can complete this project for you." Loyalty was "convinced based on them being certified developers, as they told [Loyalty], that they would be able to address the issues [Loyalty] w[as] having in Kentico and with specifically Kentico Portal."

{¶14} So, Loyalty hired Empirical to work on its website, a relationship governed by "the rubric of the Upwork agreement" (the Upwork agreement is not in the record). That agreement governed "the first month or two, and then it became . . . a direct relationship." Stemmer testified that Loyalty "decided to extend the relationship" because Loyalty "had a number of projects . . . for our conference the following year [and] for the association website in general."

{¶15} The parties agree that their business relationship continued without an express written agreement, and that Loyalty agreed to pay Empirical $50 an hour.

**{¶16}** According to Johnson, Loyalty hired Empirical for "a complete suite of services," including "website services." At one point, Loyalty and Empirical met multiple times each week. Johnson testified:

> Empirical Edge, being certified developers, would help address, fix some of the code issues we had in our current site. We would map out what the challenges were, as I mentioned. Whether its [sic] registration, pages timing out, we would map it out. We would develop what we liked in the page and we would send that to them in what's called a PSD file. And they, being experts, would take that and integrate it into the site based on the functionality that we kind of detailed – in intricate detail to them and their developers.

**{¶17}** Johnson first testified that Empirical represented to him that its developers were Kentico certified. Later, however, he explained that this understanding arose from Empirical "represent[ing] on Upwork as being certified developers" and having "a series of Kentico logos on their site." Johnson said he learned that Empirical was not Kentico certified in 2021.

**{¶18}** According to Parikh, "in 2018 [] Loyalty360 reached out to Empirical Edge for that Kentico website development and announcement with .NET code modifications." Parikh testified that Loyalty "provided the source code of Kentico that's written in .NET." But Parikh explained that "it was not a requirement either from the Loyalty360 that it was supposed to be a [Kentico] certified developer." And if Johnson had asked Parikh if the Empirical employees assigned to work on Loyalty's website were Kentico certified, Parikh "would have explained to him clearly that it's not required because it's not a programming language."

7

**{¶19}** Parikh described routine meetings with Loyalty in which Loyalty notified Empirical of changes to be made to Loyalty's website. Generally, Loyalty sent instructions to Empirical to "develop this," Empirical then notified Loyalty of its progress, and Empirical subsequently invoiced Loyalty for the work.

### C. *Empirical's work on Loyalty's website*

**{¶20}** According to Johnson, Loyalty's concerns with Empirical's billing practices and incomprehension of Kentico were "fairly apparent early on" due to the time and energy Loyalty expended "mapping out the web page and then . . . doing tons of research, hours of research going back to Kentico." Loyalty's website never performed as expected during the parties' more-than-three-year relationship. Johnson explained that sometimes the website was offline for half of a day and other times, "the website would be available in Cincinnati but not in – you know, in Denver." And there were times when customers could not access registration features. Johnson testified that Loyalty was frustrated over its lack of access to the source code.

**{¶21}** Stemmer testified that Empirical's initial revamp of Loyalty's website went "okay," though it was "very basic" and consisted of "updating [design elements and] basic language that we needed someone to help with for [the 2018] event." Its existing website was "very complicated" due to the "different permissions" tethered to "membership levels." Different levels afforded access to "different content," so "there's a lot of interdependencies." The relationship became "turbulent at best" as Loyalty demanded more from Empirical. She recalled "a lot of back and forth of different developments being promised and under-delivered or something would be launched, other things would break." Stemmer recalled customers being "timed out of the website and charged the wrong amount of money for their membership." All the while, Empirical could not explain why the website was malfunctioning.

8

**{¶22}** Johnson's explanation for Loyalty's continued use of Empirical's services, despite its dissatisfaction with Empirical's work, vacillated. At different points in his testimony, Johnson explained that it continued to use Empirical's services because (1) Loyalty pivoted its business to focus on "the brand membership, the brand community model" during the COVID-19 pandemic and Loyalty needed to reconfigure its website to reflect that change; (2) Loyalty "would have had no source code, no website, nothing" without Empirical; and (3) Empirical is "a fairly inexpensive development group."

**{¶23}** Stemmer testified that Loyalty continued to work with Empirical because Empirical gave assurances that it could fix the issues. According to Johnson, Empirical was "never able to truly tell [Loyalty] why things were offline, why things were breaking. They would fix the star, they provided the site, and the site would be offline." Johnson testified that after the parties' relationship ended, Loyalty hired new developers to fix Empirical's work and "[r]emov[e] all of the hacks."

**{¶24}** Parikh remembered things differently. He testified that Loyalty's website "never went down." There was, however, a "one time [] issue with the SSI certification," though the website "never went down." In fact, Parikh "never received any complaint[s]" from Loyalty and there was never a time that he did not "immediately jump on" an issue that Loyalty brought to his attention.

### D. *Loyalty's app*

**{¶25}** In 2020, Loyalty discussed with Empirical the development of a mobile app for its conference, which would allow Loyalty to award prizes to and engage with attendees. Johnson explained that this required permissions and registration information from both "the Loyalty360 website and the conference website." Empirical assured Loyalty that it could develop the mobile app. Johnson expected

9

development to cost $36,000, but it "ended up being way beyond that." Empirical invoiced Loyalty $87,000 for the second half of 2021.

**{¶26}** Johnson recalled that the mobile app's functionality lagged as Loyalty's 2021 conference grew closer. Ultimately, Empirical failed to deliver a workable mobile app for Loyalty's conference. Johnson recalled an email from Parikh after the 2021 conference "saying they were not able to make the functional requirements but they hope to be able to update it going forward in a manner that was what we wanted." That email is not in the record.

**{¶27}** Stemmer testified that Empirical could not explain why the mobile app did not work. She recalled issues with a "license limitation with Kentico that they were not aware of until four days before the conference was live[,] . . . log-in issues[,] and [t]he app kept crashing." The app "barely made it live into the [app] store, but when it was live, it didn't work." Empirical did not have "a Kentico license to use the app, which was not found out until four days before the conference."

**{¶28}** Parikh, however, told a different story. He testified that the mobile app was a "stand-alone app" that only interacted with Loyalty's website through the "back end sequence." Empirical "developed and delivered the app to Loyalty 360." The "app was on the Loyalty360 IOS and Android App Store accounts." According to Parikh, the mobile app was "provided in the e-mails on the details that's been provided and also a recording of the whole app that's been reviewed with Mark and Carly before – during the development." Parikh recalled that Loyalty "use[d] the app at their conference."

### E. *Empirical's invoices*

**{¶29}** Johnson testified that Empirical's invoices skyrocketed in 2021 after Empirical began working on Loyalty's app. From December 2021 to January 2022, Loyalty's website was offline because of nonpayment to the platform host. The website

remained offline as Empirical refused to hand over the website's source code. Johnson acknowledged that Loyalty had refused to pay its outstanding balance on Empirical's invoices and that paying the balance would have resolved the issue. Instead, Loyalty had to rely on a "compiled code . . . from a backup source" to relaunch the website.

**{¶30}** Parikh testified that Empirical "successfully completed for Loyalty360 five Expos with all of those notifications and the changes." The friction between Loyalty and Empirical began "when the outstanding balance reached $37,000 and [Johnson] decided not to pay that balance and to walk away with that." In fact, there was never a time that Loyalty was up to date on its payments—"[i]t was always delayed, and there was always an outstanding balance."

**{¶31}** Empirical's invoices support Parikh's testimony. While Loyalty reduced its balance to $720.50 in June 2021, that balance grew during the remainder of 2021. Loyalty's balance increased to $10,570.50 in July, $24,290.50 in August, $25,765.50 in September, $31,098 in October, $34,085.50 in November, and $36,210.50 in December 2021. Johnson said he suspected Empirical of overbilling Loyalty, citing two times that Empirical "credited" Loyalty for "56 hours [and] for over 200 hours."

**{¶32}** Parikh testified that Johnson ignored his requests for the outstanding $37,000 owed to Empirical. Then, Parikh recalled, Johnson "started sending me the nasty e-mails with the bullying me, me and all of my employees and stuff also, and also like—saying various stuff about the Indians and intellectually of the Indians and stuff like that." Johnson admitted to sending "potentially racist statements against Indian people" out of "[e]xtreme frustration."

*The trial court granted Empirical's motion for a directed verdict*

**{¶33}** Empirical moved for a directed verdict. The trial court granted Empirical's motion because Loyalty "failed sufficiently to prove the establishment of

breach of contract and unjust enrichment." The trial court also found that Loyalty breached the contract first by failing to pay Empirical in full. And the trial court found that Loyalty failed to produce competent evidence establishing that it would be unjust to allow Empirical to retain the amounts paid.

## II. Analysis

**{¶34}** In a single assignment of error, Loyalty argues that the trial court ignored Civ.R. 50(A)(4)'s standard for directed verdicts. Second, Loyalty claims that the trial court erred when it found that Empirical was not unjustly enriched.

### A. *Directed verdicts are inapplicable to bench trials*

**{¶35}** Loyalty is correct that Civ.R. 50(A)(4) instructs a trial court to enter a directed verdict only "after construing the evidence most strongly in favor of the party against whom the motion is directed." But following a bench trial, a trial court renders a judgment, not a verdict. *See Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 7 (10th Dist.). As such, a trial court cannot direct a verdict after a bench trial because no jury exists. *See Hayes v. Carrigan*, 2017-Ohio-5867, ¶ 21 (1st Dist.). So, motions for judgment at the conclusion of a plaintiff's case in a bench trial are Civ.R. 41(B)(2) motions to dismiss, not Civ.R. 50 directed-verdict motions. *See Geiler Co. v. Bd. of Trustees of the Pub. Library of Cincinnati*, 2024-Ohio-5793, ¶ 33 (1st Dist.), quoting *Beal v. Bauer*, 2014-Ohio-614, ¶ 8 (1st Dist.).

**{¶36}** But a trial court's mistaken reliance on the directed-verdict standard when entering judgment for the defendant in a bench trial is harmless so long as dismissal was appropriate under Civ.R. 41(B)(2), "'because the [directed verdict] standard is much more rigorous than the involuntary dismissal standard.'" (Citations omitted in *Geiler*.) *Geiler* at ¶ 34, quoting *Jarupan* at ¶ 10. While courts must construe evidence most strongly in the nonmoving party's favor before directing a verdict under

Civ.R. 50(A)(4), trial courts considering a dismissal under Civ.R. 41(B)(2) must "'determine the facts by weighing the evidence and resolving any conflicts therein.'" *Id.* at ¶ 36, quoting *Jarupan* at ¶ 9. Dismissal under Civ.R. 41(B)(2) is appropriate "if a trial court finds that the plaintiff has failed to meet [its] burden of proof." *Id.,* quoting *Jarupan* at ¶ 9. Said differently, the trial court must dismiss a case under Civ.R. 41(B)(2) if it "finds that the plaintiff's evidence is not persuasive or credible enough to satisfy [its] burden of proof." *Jarupan* at ¶ 9.

**{¶37}** This court will not reverse a trial court's judgment under Civ.R. 41(B)(2) unless the trial court's decision is "'erroneous as a matter of law or against the manifest weight of the evidence.'" *Geiler* at ¶ 37, quoting *Beal* at ¶ 9.

### B. *Loyalty failed to establish the relevant terms of the oral contract*

#### 1. Breach-of-contract law

**{¶38}** Contracts are promises between parties that give rise to lawsuits if the promises are broken. *Deffren v. Johnson*, 2021-Ohio-817, ¶ 16 (1st Dist.), quoting *Kostelnik v. Helper,* 2002-Ohio-2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.,* 436 F.Supp. 409, 414 (N.D.Ohio 1976). To establish that Empirical breached the parties' contract, Loyalty's evidence had to show (1) that the parties entered into a contract; (2) the breaching party's unexcused failure to perform its duties under the contract; and (3) damages resulting from the breach. *See Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41.

**{¶39}** An oral contract, by its very nature, "contains no express provision defining its terms." *Id.* at ¶ 17. A party attempting to establish the existence of an oral contract and its terms with sufficient particularity carries a "'heavy burden.'" *Deffren* at ¶ 19, quoting *Sagonowski v. The Andersons, Inc.,* 2005-Ohio-326, ¶ 14 (6th Dist.),

quoting *Bowes v. Toledo Collision—Toledo Mechanical, Inc.,* 2000 Ohio App. LEXIS 3727, *9 (6th Dist. Aug. 18, 2000). The party must present clear and convincing evidence of each element of the oral contract. *Kodu v. Medarametla,* 2016-Ohio-8020, ¶ 9 (1st Dist.).

**{¶40}** An oral contract's terms must be "definite and certain." *U.S. Bank, N.A. v. Higbee Lancoms, LP,* 2021-Ohio-1799, ¶ 23 (1st Dist.). Courts discerning an oral contract's terms look to "the facts and circumstances surrounding the offer and acceptance." *Id.* The evidence must show that the parties had a meeting of the minds on the contractual terms. *N. Side Bank & Trust Co. v. Trinity Aviation LLC,* 2020-Ohio-1470, ¶ 15 (1st Dist.). When determining whether there was a meeting of the minds, courts look for "objective manifestations of intent." *Bliss v. Chandler*, 2007-Ohio-6161, ¶ 56 (11th Dist.), quoting *Huffman v. Kazak Bros.*, 2002-Ohio-1683, ¶ 23 (11th Dist.). As such, "the parties must express their intent in a manner susceptible of judicial interpretation." *Maddali v. Haverkamp,* 2022-Ohio-3826, ¶ 27 (1st Dist.).

### 2. Loyalty did not establish a breach

**{¶41}** In dismissing Loyalty's breach-of-contract claim, the trial court made three relevant findings. First, it limited the claim to the work performed on Loyalty's website because "the Complaint only includes reference to a 'website' not a 'mobile app.'" Second, it found that Loyalty's evidence failed to establish a meeting of the minds regarding the terms of the contract. Third, it alternatively found that Loyalty "breached the contract first by failing to pay invoices in full."

**{¶42}** Loyalty challenges the trial court's decision and argues that the evidence demonstrates the existence of a contract. According to Loyalty, Empirical agreed to assign Kentico-certified employees to develop Loyalty's website and mobile application in exchange for compensation. It maintains that Empirical breached that

agreement when it failed to assign Kentico-certified employees to work on Loyalty's website and when it failed to develop Loyalty's website.

**{¶43}** We agree with the trial court's conclusion that Loyalty failed to establish a breach of the oral contract. For service contracts, "the essential terms are, in general, the parties to the contract and the subject matter." *Jag Imperial, LLC v. Literski,* 2012-Ohio-2863, ¶ 18 (1st Dist.).

**{¶44}** Johnson's and Parikh's testimony shows that Loyalty and Empirical agreed that Empirical would develop Loyalty's website and application in exchange for compensation at a rate of $50 per hour. But Loyalty's evidence failed to establish a meeting of the minds regarding the alleged terms that Loyalty claims were breached.

**{¶45}** First, the evidence does not conclusively show that Empirical agreed to assign only Kentico-certified developers to work on Loyalty's website. Johnson's testimony makes clear that Loyalty desired Kentico-certified developers. But Parikh's testimony contradicted Loyalty's claim that the parties agreed that Empirical's developers would be Kentico certified. Parikh testified that assigning Kentico-certified employees to work on Loyalty's website "was not a requirement." And if Loyalty had insisted, Parikh would have said that the certification was unnecessary to develop the website. Because the evidence does not establish a meeting of the minds regarding the use of Kentico-certified developers as a contract term, the use of noncertified developers cannot serve as the basis for Loyalty's breach-of-contract claim.

**{¶46}** Second, Loyalty's breach-of-contract claim is based on Empirical's allegedly slipshod development of Loyalty's website. But Loyalty's evidence failed to establish the oral contract included either a standard of performance governing Empirical's development services, or Loyalty's satisfaction of Empirical's development, as contract terms. While Johnson and Stemmer described website

15

interruptions and functionality issues, there was testimony that Empirical updated Loyalty's website. In other words, the evidence established that Empirical delivered website-development services, albeit to Loyalty's dissatisfaction. The issues described by Loyalty corresponded with the increasing complexity of Loyalty's requests.

**{¶47}** Third, Loyalty agreed to pay Empirical for its development services and Empirical's financial statements in the record support Parikh's testimony that Loyalty failed to pay Empirical's invoices in full. To succeed on a breach-of-contract claim, a plaintiff must prove, among other things, "*the plaintiff's performance of the contract*." (Emphasis added.) *Andrew v. Power Marketing Direct, Inc.,* 2012-Ohio-4371, ¶ 34 (10th Dist.). An unjustified "failure to perform any promise that forms a whole or part of a contract" constitutes a breach of contract. *H&H Glass, Inc. v. Empire Bldg. Co., LLC,* 2016-Ohio-3029, ¶ 7 (1st Dist.). This court, and others, have held that "[w]rongfully and consistently withholding payment of labor costs can fairly be characterized as a breach going to the 'essence' of the parties' agreement." *Id.,* citing *Ernst v. Ohio Dept. of Adm. Servs.*, 69 Ohio App.3d 330, 337 (10th Dist. 1990). While Loyalty claims the evidence proves that Empirical breached the contract, Loyalty had breached the contract as early as 2020 when it failed to pay Empirical for its services.

**{¶48}** In sum, the weight of the evidence supports the trial court's determination that Loyalty failed to establish the relevant terms of the contract. While Loyalty's evidence proved the existence of the oral contract's essential terms, its evidence failed to establish the terms relevant to its breach-of-contract claim. And the trial court's decision to enter a directed verdict in favor of Empirical on Loyalty's breach-of-contract claim was harmless because the evidence supported a dismissal of Loyalty's claim under Civ.R. 41(B)(2).

### C. *The existence of the oral contract precludes Loyalty's unjust-enrichment claim*

**{¶49}** Loyalty also challenges the trial court's rejection of its unjust-enrichment claim. An unjust-enrichment claim allows a plaintiff to recover damages when the plaintiff conferred a benefit on the defendant, the defendant knew about the benefit, and the defendant retained the benefit, despite it being unjust to do so without compensating the plaintiff. *Fox Consulting Group, Inc. v. Mailing Servs. of Pittsburgh, Inc.,* 2022-Ohio-1215, ¶ 10 (1st Dist.).

**{¶50}** But unjust-enrichment claims are "only available in the absence of an enforceable contract." *Deffren*, 2021-Ohio-817, at ¶ 10 (1st Dist.). An unjust-enrichment claim is not a "fail-safe in the event that [a plaintiff] does not recover on its contract claim." *Wadsworth Pointe Health Care Group, Inc. v. Baglia*, 2018-Ohio-1978, ¶ 24 (9th Dist.).

**{¶51}** Because an oral contract governed Loyalty's payments in exchange for Empirical's development services, Loyalty cannot recover under its unjust-enrichment claim.

### III. Conclusion

**{¶52}** We overrule the sole assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**KINSLEY, P.J.,** and **CROUSE, J.,** concur.